**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE**

<u>Debra Jean Couitt</u>

    **v.**　　　　　　　　　　　　　　　Case No. 11-cv-124-PB
　　　　　　　　　　　　　　　　　　　　Opinion No. 2012 DNH 066
<u>Michael J. Astrue, Commissioner,
Social Security Administration</u>


<u>**MEMORANDUM AND ORDER**</u>

    Debra Jean Couitt seeks judicial review of a decision by the Commissioner of the Social Security Administration denying her application for disability insurance and supplemental security income benefits.  Couitt contends that the Administrative Law Judge ("ALJ") who heard her case erred in making the residual functional capacity assessment, which led to an error in determining that she was not disabled.  The Commissioner moves to affirm the decision.  For the reasons provided below, I reverse the decision and remand the case for further administrative proceedings.


**I.　BACKGROUND**[1]

    Couitt filed applications for disability insurance and supplemental security income benefits on May 29, 2009, when she was fifty-one years old.  She had a high school education and

---

[1] The background information is taken from the parties' Joint Statement of Material Facts (Doc. No. 13) and the administrative record.  <u>See</u>  LR 9.1(b).

had worked as a delivery driver and in an auto parts machine shop.  Couitt alleged disability due to back pain.

A. **Medical History**

Couitt had a history of chronic low back pain beginning in the 1980s.  An MRI done in February 2009 showed disc changes at many levels, which were worst at L3-4 where she had a central disc herniation and an annular tear.  She also had a small disc protrusion at L5-S1.  An x-ray of her lumbar spine done on the same day show multilevel degenerative changes with the greatest changes at L3-4 and L5-S1.  On February 20, 2009, Couitt saw Dr. Brian Carney for an orthopedic consultation.  Dr. Carney concluded that Couitt had chronic low back pain due to degenerative lumbar disc disease.

Couitt had a mental health evaluation in March 2009 due to stress related to caring for her mother, who was in the final stages of Alzheimer's disease.  On March 23, Couitt reported to her physical therapist that she had lost her job.

On April 14, 2009, Couitt went to the emergency room at Mount Ascutney Hospital due to back pain.  She was seen by Jeffrey Ketchen, PA-C.  Ketchen noted that Couitt appeared to be in moderate pain. Based on his examination, Ketchen found Couitt had normal strength, normal neurovascular and sensory results, normal gait and body control, mild to moderate muscle spasm in the left side of her lower back, no bony point

2

tenderness, no leg weakness, and normal reflexes.  Despite a significant decrease in range of motion in her back, Couitt's straight leg raising was negative.  Ketchen prescribed a small amount of Percocet and back exercises.

Couitt had an appointment with Dr. Jessica Fisher on April 22, 2009, to establish a primary care relationship.  Couitt reported that her back pain had been manageable with ibuprofen until recently, when it had worsened.  She said that prolonged sitting, standing, or walking increased her pain, that medications made her tired without providing relief, and that she used exercises prescribed by a physical therapist each morning.  Couitt said that she was no longer able to work.  Dr. Fisher found normal strength in Couitt's legs and pain on the left side and lower area of her back.  Dr. Fisher noted that Couitt's back pain was not well controlled with non-narcotic medication, that narcotic medication was not advisable, that physical therapy had not been successful, and that, based on an orthopedic consult, Couitt was not a candidate for surgery.  Dr. Fisher referred Couitt to pain management services for a possible epidural steroid injection.  On May 6, Dr. Fisher wrote a note for Couitt to excuse her from work due to disability.

Sharon Besson, Nurse Practitioner, saw Couitt at a pain clinic on June 9, 2009.  Couitt related her history of back pain, explained that she had lost her job because of missing

3

work to care for her mother, and described her limitations due to back pain. Although Couitt easily walked into the examination room, Besson noted that Couitt was uncomfortable sitting. On examination, Besson found tenderness and knotting in her back but a full range of motion in her legs with intact motor strength and sensation. After the appointment with Besson, Couitt contacted urgent care asking for a renewal of her pain medication because the pain clinic had not renewed the prescription. On June 10, Couitt talked to Dr. Fisher about narcotic pain medication, and Dr. Fisher told her she would have to be seen in the clinic first and that long-term narcotics were not a solution to her pain.

Dr. Fisher saw Couitt on July 2, 2009, and explained that her back pain could not be managed with narcotic medication alone. They discussed options, and Couitt agreed to try a combination of non-narcotic medications, heat and ice, and physical therapy. On examination, Couitt's spine was not tender; her pain was nine of ten in the lower back; her gait was mildly antalgic (a limp with a short standing phase); she was able to walk on her heels and toes; and she had no signs of radiculopathy. Couitt also complained of joint pain in her neck and hands. Couitt admitted to using marijuana with a neighbor, which caused a positive urine screen. On July 10, Dr. Fisher reminded Couitt to take advantage of mental health therapy,

4

biofeedback, or the chronic pain support group.  After Couitt's urine screen was negative, Dr. Fisher prescribed a two-week course of Percocet.

In August 2009, a state agency reviewing physician, Dr. Burton Nault, completed a residual functional capacity assessment ("RFC") based on a review of Couitt's medical records.  Dr. Nault determined that Couitt could occasionally lift up to twenty pounds and could frequently lift ten pounds.  He also found that Couitt could sit, stand, and walk for six hours in an eight-hour work day as long as she had a sit or stand option, and that she could occasionally do postural activities such as climbing and stooping.

Couitt had a consultative psychological examination with Francis Warman, Ph.D., on August 27, 2009.  Couitt said that she was doing light housecleaning and chores, that she went for walks, and that she visited her mother.  Dr. Warman noted that Couitt's pain limited her lifting ability but that she appeared to be able to do most activities of daily living.  He thought that she was dealing with chronic pain, could benefit from the pain clinic, and that she had some limitations in activities of daily living but was able to function satisfactorily.

On November 9, 2009, Couitt had an appointment with Dr. Fisher, and they discussed her pain and options for therapy.  Dr. Fisher recommended Tylenol and ibuprofen for Couitt's neck

5

and hand pain and continued Nortriptyline for back pain.  Dr. Fisher also recommended participation in a chronic pain group, trigger point injections, ice, heat, and physical therapy.

On November 12, 2009, Dr. Christopher D. Nice at the Veterans Administration Medical Center completed an annual review of Couitt's records and noted multiple pain syndromes, trigger points, and features of fibromyalgia.  He concluded that physical therapy was the best treatment.

In February 2010, Dr. Fisher completed a form for Couitt's credit card company in which she stated that Couitt would be disabled from work until the end of June 2010.  In March 2010, Dr. Fisher saw Couitt and noted that her back pain was unchanged.  Couitt reported that she was most uncomfortable when sitting or lying down, that the trigger point injections were not helpful, that she was not taking Tylenol because it was not helpful, that she was not taking ibuprofen because it upset her stomach, that she was taking Nortriptyline, which she thought was helping her to sleep and to feel better, and that she had not tried a chronic pain support group or biofeedback.  Couitt also said that her hands were painful, making it difficult to do fine-motor tasks.

On March 29, 2010, Couitt saw Dr. Jonathan Jones, a fellow in rheumatology, for a consult because x-rays of her hands showed erosive osteoarthritis.  Couitt described symptoms of

6

numbness and burning in her fingers, which was causing her to drop things.

Couitt saw Dr. Fisher again on June 29, 2010, and reported that her back pain was worse than usual after moving out of her apartment. Dr. Fisher diagnosed Couitt with chronic back pain, osteopenia (pertaining to bone density), and likely inflammatory arthritis in her hands. Dr. Fisher increased Couitt's dose of Nortriptyline and started a new medication, Tramadol. He also ordered a back brace and a functional capacity evaluation. Couitt had an out-patient physical therapy appointment and was fitted for a back brace. She also got a MedicAir Back Pillow to use while driving.

On June 30, 2010, Couitt saw Dr. Jones again for her hand pain. He thought that carpal tunnel syndrome and rheumatoid arthritis were unlikely and that her pain was more likely due to erosive arthritis. He prescribed a trial use of hydroxychloroquine.

On August 26, 2010, Jeff Abrahamson, OT/L, CWCE, an occupational therapist, performed a functional capacity evaluation on referral from Dr. Fisher. Abrahamson's evaluation included a musculoskeletal evaluation, mobility screening, cardiovascular fitness, pinch and grip strength testing, dexterity testing, strength pushing, strength pulling, strength carrying, strength occasional lifting, physical effort,

7

competitive test performance, clinical consistency, reliability of pain and disability reporting, and recommendations. Abrahamson concluded that Couitt could sit for a sustained period of one hour, with two hours total in a day, and could stand for thirty minutes sustained, with an hour and a half total in a day.  He noted that Couitt was in pain when she left the testing site and was still in pain the next day.

Testing showed that Couitt's hand strength was weak.  Her fine and medium motor coordination were mildly to moderately impaired, which was consistent with the arthritis objectively observed in her hands.  She could perform lifting tasks at the sedentary to light level but only with increased pain.  She could lift up to twenty pounds occasionally, could carry up to forty pounds occasionally, and could push or pull forty to forty-eight pounds occasionally.  Cardiovascular testing showed that Couitt could perform work at the medium exertional level, but Abrahamson noted that she could not functionally perform at that level because of pain, which was demonstrated during the testing process.  In Abrahamson's opinion, based on his tests for effort and reliability and his clinical observations, Couitt maintained high levels of effort and her reports of pain and disability were fully reliable.  Abrahamson concluded that pursuing disability benefits was the most appropriate option for Couitt.

**B.   Hearing**

A hearing before an ALJ was held on August 30, 2010. Couitt testified at the hearing and was represented by counsel. A vocational expert also testified.

Couitt testified that she stopped working on May 29, 2009 because of back pain, which had interfered with her work for a year.  She said that she had pain in her left lower back and had arthritis in her neck and fingers.  She stated that she typically spent most of the day using a heating pad and got up only occasionally to do chores around the house.  Couitt testified that she had been prescribed "Prematol" but was not taking pain medication because she did not like the way she felt with medication.  She also stated that physical therapy, biofeedback, and steroid shots had not helped.  She was able to take care of herself and tried to do things around the house. She also drove to visit her mother twice a week.

The vocational expert testified that Couitt's previous work as a delivery driver and in auto parts manufacturing was unskilled work at the medium exertional level.  The ALJ posed a hypothetical question to the vocational expert regarding the capabilities of a person who could occasionally lift twenty pounds, could frequently lift ten pounds, could stand and walk for six hours in an eight-hour work day, could sit for six hours with an option to alternate between sitting and standing, had

unlimited use of her hands and feet, and could operate controls, push, and pull.  The vocational expert testified that such a person could not do Couitt's prior work but could do jobs at the light exertional level such as a companion, a storage area clerk, a survey assistant, and an office helper.  Couitt's attorney asked if a person who could only stand for a couple of hours during a work day would be able to do the identified jobs, and the vocational expert agreed that none of the jobs would be available.[2]

**C.  Decision**

The ALJ issued his decision on September 23, 2010, finding that Couitt was able to do work at the light exertional level with a sit or stand option.  Based on that RFC, the ALJ relied on the vocational expert's opinion about what jobs were available and concluded that Couitt was not disabled.  The Decision Review Board ("DRB") informed Couitt that the ALJ's decision was selected for review.  Couitt's attorney submitted a letter from Dr. Fisher, dated October 20, 2010, to the DRB.  On January 13, 2011, the DRB notified Couitt that it had not

---

[2] The ALJ and Couitt's attorney agreed that if Couitt were limited to sedentary work, she would be found disabled under the Medical Vocational Guidelines, 20 C.F.R. Part 404, Subpart P.

[3] Because the DRB did not consider the letter from Dr. Fisher, the letter is not part of the administrative record in the case

10

completed a review within the time allowed, making the ALJ's decision the final decision of the Commissioner.[3]

## II. **STANDARD OF REVIEW**

Under 42 U.S.C. § 405(g), I am authorized to review the pleadings submitted by the parties and the transcript of the administrative record and enter a judgment affirming, modifying, or reversing the "final decision" of the Commissioner.  My review is limited to determining whether the ALJ used "the proper legal standards and found facts [based] upon the proper quantum of evidence."  Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000).

The findings of fact made by the ALJ are accorded deference as long as they are supported by substantial evidence.  Id.  Substantial evidence to support factual findings exists "'if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion.'" Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam) (quoting Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)).  If the substantial evidence standard is met, factual findings are

---

[3] Because the DRB did not consider the letter from Dr. Fisher, the letter is not part of the administrative record in the case and will not be considered here.  Mills v. Apfel, 244 F.3d 1, 4 (1st Cir. 2001); Costa v. Astrue, 2010 WL 4365868, at *1 (D.N.H. Nov. 3, 2010).

11

conclusive even if the record "arguably could support a different conclusion." Irlanda Ortiz, 955 F.2d at 770.

Findings are not conclusive, however, if they are derived by "ignoring evidence, misapplying the law or judging matters entrusted to experts." Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999). The ALJ is responsible for determining issues of credibility and for drawing inferences from the evidence on the record. Irlanda Ortiz, 955 F.2d at 769. It is the role of the ALJ, not the court, to resolve conflicts in the evidence. Id.

The ALJ follows a five-step sequential analysis for determining whether an applicant is disabled. 20 C.F.R. §§ 404.1520, 416.920. The applicant bears the burden through the first four steps of proving that her impairments preclude her from working. Freeman v. Barnhart, 274 F.3d 606, 608 (1st Cir. 2001). At the fifth step, the ALJ determines whether work that the claimant can do, despite her impairments, exists in significant numbers in the national economy and must produce substantial evidence to support that finding. Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001).

### III. ANALYSIS

The ALJ found that Couitt retained the residual functional capacity to do light work with a sit or stand option and determined at the fifth step of the sequential analysis that

work existed in the requisite numbers that she could do. Couitt contends that the ALJ erred because he improperly assessed her RFC and relied on the vocational expert's opinion in response to the erroneous RFC to find that she was not disabled. The Commissioner defends the decision.

**A.   Weight Given to Opinion of Occupational Therapist**

The ALJ gave limited weight to the opinion provided by Jeff Abrahamson, a licensed occupational therapist, because he is not an "acceptable medical source" under the regulations and because the ALJ thought Abrahamson relied on Couitt's subjective complaints, which the ALJ believed were contradicted by the objective test results. Because an occupational therapist is not an acceptable medical source under the Social Security regulations, Abrahamson could not provide a medical opinion to establish the existence of an impairment. 20 C.F.R. §§ 404.1513(a), 416.913(a); see also 20 C.F.R. §§ 404.1527, 416.927. Opinions from non-medical sources, however, can provide information about the severity and functional effects of an established impairment. 20 C.F.R. §§ 404.1513(d), 416.913(d); SSR 06-03p, 2006 WL 2329939. In making a residual functional capacity assessment, an ALJ is required to consider all of the record evidence. Alcantara v. Astrue, 257 Fed. Appx. 333, 334-35 (1st Cir. 2007); Friedman v. Astrue, 2011 WL 4590563, at *13 (D. Mass. Sept. 28, 2011).

13

In this case, the ALJ found that Couitt had a severe impairment due to degenerative disc disease of the lumbar spine that caused low back myofascial pain.[4]  Abrahamson, a licensed occupational therapist, provided an opinion about Couitts's ability to function in a work setting based on his testing and observations during the testing process.  As such, Abrahamson did not offer a medical opinion about the existence of an impairment but instead provided evidence about the severity and functional effect of an impairment diagnosed by medical sources.  Such an opinion is assessed based on factors such as the source's relationship with the claimant, how consistent the opinion is with other evidence, the amount of relevant evidence provided to support the opinion, the explanation of the opinion, and the source's specialty or area of expertise.  SSR 06-03P, 2006 WL 2329939, at *4-*5 (Aug. 9, 2006).

Abrahamson is a licensed occupational therapist.  Dr. Fisher referred Couitt "for an assessment of her physical abilities and limitations related to work."  Admin. Rec. at 402.  As part of his assessment, Abrahamson evaluated whether Couitt gave her maximal effort during testing, whether her subjective reports of pain and disability were reliable, and whether Social Security benefits were appropriate.  Abrahamson concluded, based

---

[4] The ALJ does not mention the issue of arthritis in Couitt's hands.

14

on "[o]verall test findings, in combination with clinical observations," that Couitt gave "high levels of physical effort" and that her reports of pain and disability were "fully reliable." Id.  In summary, Abrahamson concluded that Couitt had weak hand strength, that her fine and medium motor coordination was mildly to moderately impaired "consistent with arthritic changes noted objectively in both hands," that she could lift at the sedentary or light levels "but only with increased pain," that her back pain was the most limiting factor, and that she demonstrated and complained of "moderate to severe pain through the evaluation."  Admin. Rec. at 404. Abrahamson recommended that Social Security benefits were the appropriate option for Couitt.

    The ALJ discounted Abrahamson's test results and recommendation, stating that he "relie[d] too heavily upon the claimant's subjective complaint of pain when objective testing supported a retained work capacity, including M.E.T. testing that demonstrated the claimant's cardiovascular status would allow her to perform at the medium level of exertion."  Admin. Rec. at 17.  The M.E.T. testing evaluated Couitt's cardiovascular functioning without considering the effect of her back pain, as Abrahamson explained in his report.  Admin. Rec. at 403.  Couitt claims disability based on lower back pain, not because of a cardiovascular deficiency, and the ALJ found that

15

she had a severe impairment due to degenerative disc disease and low back pain. Therefore, the ALJ's reference to Couitt's cardiovascular function is irrelevant to an assessment of her ability to work despite her impairment due to back pain. Further, Abrahamson's report documents the objective bases for his assessment of Couitt's effort and reliability, which undermines the ALJ's criticism that Abrahamson relied too heavily on subjective complaints.

**B.  Residual Functional Capacity Assessment**

The ALJ determined that Couitt retained the ability to perform light work, as defined by 20 C.F.R. § 404.1567(b) and § 416.967(b) with the freedom to alternate between sitting and standing.[5] The ALJ also found that Couitt could stand, walk, or sit for six hours in an eight-hour day, had full use of her hands and feet to operate hand and foot controls, and could occasionally perform postural activities. In support of his assessment, the ALJ summarized some of Couitt's medical history, noted that Abrahamson found she was capable of sedentary to light range of exertion, and stated that "none of the claimant's treating physicians have described the claimant as disabled" and that "most treating sources recommend that the claimant remain as active as possible." Admin. Rec. at 17.

---

[5] The ALJ provided the wrong definition for light work in his decision.

16

Contrary to the ALJ's summary of the medical evidence, on February 9, 2010, Dr. Fisher, Couitt's primary care physician, wrote on disability paperwork for Couitt's credit card company that Couitt would be disabled until June 30, 2010.  In June, Dr. Fisher noted that Couitt's back pain was worse and ordered a back brace and a functional capacity evaluation.[6]  Couitt received the back brace on June 28, 2010, and Abrahamson completed the functional capacity evaluation in August, concluding that Social Security benefits were the most appropriate option for Couitt.

In addition, the ALJ does not provide a clear explanation for his RFC assessment.  The ALJ's recitation of parts of the medical evidence does not indicate why those parts support his finding that Couitt was able to do light work.  While he notes that Couitt was not a candidate for surgery and her physicians recommended a conservative treatment course, he does not explain why those circumstances show she is able to do light work despite her back pain.  The ALJ also states that Couitt was not "currently taking medication."  Admin. Rec. at 18.  At the hearing, however, Couitt testified that she had been prescribed "Prematol" but tried to treat pain with a heating pad or ice because she did not like the feeling medications caused.  The

---

[6] The ALJ appears to have confused the chronology of Couitt's treatment.

17

ALJ does not explain the significance of his note about Couitt's medications.

The ALJ also failed to provide any citation to an evaluation in the record to support his assessment. The ALJ's assessment is similar to the RFC assessment done by the state agency physician in August 2009. To the extent the ALJ relied on that assessment, however, it was based on the record as it existed before August 2009. Therefore, that assessment did not consider Couitt's records generated after that time, including the opinions of Dr. Jones about arthritis in Couitt's hands, the prescription of a back brace, and Abrahamson's evaluation. An opinion of a state agency consultant that is based on an incomplete record does not provide substantial evidence to support the ALJ's RFC assessment. McAulay v. Astrue, 2012 WL 911423, at *6 (D.N.H. Mar. 16, 2012); Spielberg v. Astrue, 2011 WL 4971971, at *6 (D.N.H. Oct. 18, 2011).

The Commissioner also argues that the ALJ could have determined Couitt's RFC based on the medical evidence alone, without relying on the state agency consultant's evaluation. "As a lay person, however, the ALJ was simply not qualified to interpret raw medical data in functional terms . . . ." Nguyen, 172 F.3d at 35; see also Berrios Lopez v. Sec'y of Health & Human Servs., 951 F.2d 427, 430 (1st Cir. 1991) ("Since bare medical findings are unintelligible to a lay person in terms of

18

residual functional capacity, the ALJ is not qualified to assess claimant's residual functional capacity based on the bare medical record.").

The Commissioner relies on the narrow exception to that rule when "the medical evidence shows relatively little physical impairment, [so that] an ALJ permissibly can render a commonsense judgment about functional capacity even without a physician's assessment." Manso-Pizarro v. Sec'y of Health & Human Servs., 76 F.3d 15, 17 (1st Cir. 1996). The exception does not apply here. The record shows that Couitt was experiencing significant pain from her back condition to the point that Abrahamson concluded that Social Security benefits were her only option and that Dr. Fisher found her disabled from work for at least several months. The ALJ chose to discredit Abrahamson's evaluation and to make his own assessment of Couitt's functional capacity. To the extent the ALJ's assessment was taken from the raw medical record, that process exceeded his qualifications.

## C. **Determination**

The ALJ determined that Couitt was not disabled based on an improper RFC assessment which the ALJ used to pose a hypothetical to the vocational expert. As a result, the vocational expert's opinions about what work a person could do with an erroneous RFC are not relevant to Couitt's claim.

19

Therefore, the record lacks substantial evidence to support the ALJ's determination.  The Commissioner's decision must be reversed and remanded for further administrative proceedings.

## IV.   CONCLUSION

For the foregoing reasons, I deny the Commissioner's motion to affirm (Doc. No. 12) and grant Couitts's motion to reverse (Doc. No. 9).  Pursuant to 42 U.S.C. § 405(g), I remand the case to the Social Security Administration for further proceedings consistent with this decision.  The clerk is directed to enter judgment accordingly.

SO ORDERED.

/s/Paul Barbadoro
Paul Barbadoro
United States District Judge

April 3, 2012

cc:  Bennett B. Mortell, Esq.
     T. David Plourde, AUSA